Our next case on the calendar is United States v. Espino. Thank you. Thank you. Ms. Baumgartel, you have to catch your breath. Nice to see you, John. Thank you for your indulgence. But we were saying it before, it's rare I couldn't think of a time where somebody had two different arguments the same day in different courtrooms on the Second Circuit. I was not expecting it. Well, it wasn't planned. We weren't trying to just make life hard for you. I hope you took the elevator. I hope the elevators work. So whatever you're set. Okay, so Ms. Baumgartel, you have reserved two minutes for rebuttal. That gives you eight minutes out of the gate. You may proceed. Thank you, Your Honor. May it please the Court. Rafael Espino's conviction should be reversed because the government presented insufficient evidence that he specifically intended to join the drug conspiracy. At best for the government, there was evidence that he knew he was participating in suspicious, possibly illegal behavior. But under numerous decisions by this Court, including United States v. Lorenzo, United States v. Torres, Rodriguez, Cruz, that was not sufficient. The Court also erred when it refused to instruct the jury as to Mr. Espino's theory of defense, which essentially explained this counterintuitive legal principle. It's a principle that wasn't otherwise conveyed in the instructions and which would have led to Mr. Espino's acquittal. The arrest here followed a short meeting between a cooperating witness with the government, Oscar Garcia Diaz, and Mr. Espino. The only evidence against Mr. Espino was what happened at that meeting. Oscar stopped cooperating after the meeting and so we didn't have his testimony at court. And that distinguishes this case from something like United States v. Anderson, where there was a witness who could give insight into how a particular conspiracy operated. Here, all that happened was that Mr. Espino showed up to a meeting and picked up a package and helped put it into a cab. After that, he was Well, there's a little more than that, right? I mean, he sort of calls an audible in the mouth, right? No, your honor, that's the government's supposition, but that's not really supported by the evidence. The evidence was that Oscar's But he was alone as in Anderson and not part of a group as in Torres, and there is this thing about Room 126, which is hard to explain, all going to whether he was a trusted member of a group, which I may not like as a basis for saying that then he must know that we've held that it is enough to do that. He's sort of stuck with that. This is much more akin to Torres, actually. So in Torres, the court emphasized that the individual was driven to the pickup, Mr. Espino was also driven to the pickup, and that he received the packages in a public place and not a location that he controlled. In Anderson, it was very different because the individual received the packages in private and they knew from the evidence, because there was this cooperator testimony, that he was going to be driving it several hundred miles on his own. That is not the situation in this case. Mr. Espino received the packages in a public place, he was never alone with them, and the government had no clear evidence as to what was supposed to happen next. It's also importantly distinct from Anderson because there, the government had evidence of repeated contacts between Anderson and the conspiracy's principals. Here we know Mr. Espino was going to meet Oscar because he had that room number 126, that's true, but there was no evidence as to how he got that room number except to the extent that the government got phone records, it showed no contact between Mr. Espino and anyone that they had identified as part of the conspiracy. So there was just a black hole where the government's evidence should have been with respect to his understanding and knowledge as to what this conspiracy was doing. It's really very similar to a number of the cases this court has decided, and in fact, if the court were to uphold Espino's conviction, you would be doing what the dissent in Anderson feared, which was essentially abrogating many, many prior precedents and expanding the inference of specific intent to cases where there really isn't sufficient evidence of it. The other problem with this case, of course, is that the jury was never instructed as to this theory of defense. The court has recognized the importance of the specific theory of defense that informs the jury of the defense, but also tells them that it's a valid legal defense. In this case, the district court refused to give the instruction. The instruction accurately stated the law, it was supported by the facts, it would have supported Mr. Espino's acquittal, and it really wasn't covered by the other instructions. The court has recognized in prior precedents cited in our brief that sort of general intent instructions are not sufficient to convey this specific idea. And there was nothing in the instructions that told the jury that if they thought that Mr. Espino was doing something suspicious and possibly illegal, but they didn't see specifically that he knew it was drugs, then they should acquit him. Well, the instruction that ultimately is given is it does not matter whether the defendant knew the substance was heroin, it is sufficient that the defendant knew it was some kind of federally controlled substance, right? Yes. But doesn't that sort of get you most of the way there? I recognize it's not the instruction that was requested, but if the jury had to find that he knew it was a controlled substance, it meant it wasn't going to be diamonds or video games. Well, there are two problems. They were also given the conscious avoidance instruction, and so I think that muddled it somewhat. But the other problem is that the jury was essentially only shown two paths, right? If Mr. Espino's conduct is suspicious, then it's criminal and he's guilty. If Mr. Espino's conduct is not sufficiently suspicious, then maybe we have a reasonable doubt. That's not really true, is it? I mean, the instruction that Judge Sullivan just quoted says he has to know it's a controlled substance. It's not enough that he's doing something suspicious. It's not enough that he knows he's doing something he affirmatively knows it's illegal, right? And I would say the evidence is certainly sufficient to think that he to find beyond a reasonable doubt that he knew he was doing something unlawful. But it's not. Your point is it's not enough to show that he knew it was drugs rather than something else. But that's what this instruction says. It has to be drugs. Your Honor, I agree that there's evidence that he knew he was doing something unlawful but not drugs. But the Your Honor started with this. The second part of what Your Honor said just was not captured by these instructions. And it really What you want is it's not enough that it's just the principle. There has to be something A theory of the defense instruction is a little bit different than a generalized instruction that this is the law. It would tell the jury this is what the defense is hanging its hat on. It's this point. And if you Yes, because of this rule that he has to know it's drugs. If you don't find that beyond a reasonable doubt, that would be a valid defense. That's what you're asking the jury be told. That's right. But the problem with the totality of the instructions without the specific instruction requested by the defense is that the government was able to argue in closing essentially that all of these suspicious circumstances, showing up for a package, having this amount of money, all of these amounted to sufficient knowledge. And there was really nothing that the defense could say back to that because the jury Why not? The defense I believe did but certainly could say the judge is going to tell you that all this stuff about he knew it was something suspicious and whatever is not enough. The judge is going to tell you that you have to find beyond a reasonable doubt that he knew that what he was going to pick up was a federally controlled substance. Right. But they couldn't say under the judge's instructions, even if you think he was committing some other crime, even if you think that he was picking up something else, he's not guilty. But why not? Because that would be consistent with the instruction the judge gave, right? If you don't think he knew it was drugs, if it was just he thought it was some other illegal thing, you can't be consistent with the judge's instruction, right? That was not the instruction the court gave. Again, the instruction the judge gave was it needs to be, he has to be guilty. He must know that what he was picking up was a controlled substance. Or the conscious avoidance instruction. Or he must be conscious avoidance. That's a different issue. That, the court was quite clear, that you can't give conscious avoidance with respect to being in the conspiracy altogether, but you can give it with respect to knowledge of a particular form of wrongdoing if that's what we've held, isn't it? But all of the evidence that supports the conscious avoidance inference is the evidence that shows he was doing something suspicious. This is, it is an extremely counterintuitive idea that if you're doing something suspicious, you're doing it criminally. You bet it is. I've never really understood it, frankly, why if you say I'm in this. You tell me, boss, what I have to do. Whatever you're up to, I don't want to know. Or the boss tells you you don't want to know exactly what we're up to, but go do and follow my instructions and you agree. It seems to me, if we were writing on a completely clean slate, you're in for a penny in for a pound. Anything that's reasonable to think might be there. And maybe you're not going to think it's a nuclear device. But if it's the most common crime that anybody's doing in this particular neighborhood at any particular time, it's pretty reasonable to think it might be drugs. But that's different. We're past that. We've said he has to know. That's the law. That's what your main point is on sufficiency. Yes, Your Honor. And respectfully, there is no evidence at this trial that that was the main crime that people in this neighborhood were doing. There's just nothing like that. We haven't said just he has to know. We have said he has to know or consciously avoid. That is, at that point, conscious avoidance can come in. And that's where I have problems with your objection to a conscious avoidance because it goes to what we've said is there. Your Honor, I see my time has expired. May I answer? You may. In this particular case, were the only evidence of Mr. Espino's knowledge and the only evidence of his specific intent to participate in the conspiracy would be his knowledge that drugs are in the bag because that was his only involvement in this crime. In that particular situation where he has to have actual knowledge in order to have the specific intent, that's where we're saying a conscious avoidance instruction is not proper. Thank you. All right. Thank you, Ms. Baumgartel. You've got two minutes for rebuttal. We'll now hear from Mr. Pellegrino on behalf of the government. Mr. Pellegrino. Good morning, Your Honors. May it please the Court. I am Assistant United States Attorney Louis Pellegrino. I represent the United States in this appeal, and together with AUSA Dominic Gentile, I represented the United States in the proceedings below. The government proved beyond a reasonable doubt that when Espino walked through that hotel room door at the Ramada Inn with his large, empty suitcase, that he knew he was there to pick up drugs. Based on the evidence presented at trial, any rational juror could have found the defendant guilty beyond a reasonable doubt. Well, tell me exactly what the evidence is that says drugs. There's at least seven key factors that show drugs here, Your Honor, and whereas the defendant has suggested that this case is most like Torres' case, could you lift your microphones up here much taller than the previous? Freakishly tall, one might say. In response to your question, Judge Lynch, there are at least seven key factors that signify that this was drugs and not some other object, whether it's sturgeon roe, computer parts, weapons, whatever else is present. Number one, Espino asked for room 126. We've already talked about that. And room 126 is universal code for drugs. No, but room 126 did not exist. Right, so that proves that he was there on behalf of Oscar, of Oscar's brother, right? Yes. But why does that say that he knows what business Oscar's brother is in? That's just one factor, Your Honor. Well, that's the one. Okay, but we're going to talk about each one. Two. He brings exactly the right size empty suitcase to the drug deal. Can I ask about that? What is the evidence in the record about it being exactly the right size? I didn't see that. I saw the argument in summation, but I didn't see that in the testimony. I didn't see that in anything else that was presented before summation. That's correct, Judge Sullivan. The evidence was that the jurors observed the suitcase. Anybody observing the suitcase, and it was featured prominently both at trial and in our closing argument. We wheeled it in front of the jury so that they could see it clearly. Well, they could see the suitcase, and so how do they know that it exactly fits 20 kilos of heroin? Because it was one of those large suitcases. They could all tell it wasn't one of those. But you can fit 20 kilos of diamonds in a large suitcase. I mean, how does that connect to drugs? Well, possibly, except that he knew that he was there to pick up the drugs. There was a text message that was exchanged between Oscar and Jose in which it was discussed. The text message said, the people there want you to repack the drugs. He asked, how is it packed? And Oscar said, we've got it in two duffel bags. And his brother essentially is saying, they want it repacked. And we relied on that to explain further to the jury that the point of getting a room, any room, was because they needed to go to the room, examine the drugs, and transfer them from the duffel bag... Could you, as you go on with E7, explain to me whether you were saying that he knew that it was drugs because the evidence showed that he was an important part of the conspiracy and trusted, and therefore, in that line of cases that we have, or whether there was any evidence specifically that he knew that there was drugs. Because so far, you've been going on, there was evidence that he knew specifically that there were drugs, and I must say, I find that very hard to take, like Room 126. But go on. But your last point, just so I understand it, is that there was a specific plan discussed by the judges that the courier would be going to this hotel room and repackaging the drugs so that the inference you're drawing from that is that the courier, who turns out to be Espino, is at least supposed to, is expected to, look at, I mean, maybe testing the drugs is going a little far, but at least is going to see packaged bricks rather than something else. Correct, Judge Lynch. In fact, it was also important that the suitcase was entirely empty, indicating, as we argued at the court below, that the defendant never intended to check into the hotel room for any length of time. It wasn't going to stay overnight. The entire purpose of getting that room, and by the way, there were extensive text messages between Oscar and his brother, Jose, where Jose was saying, get a room, get a room, did you get a room yet? And the intent of getting that room was exactly as you suggested. So although the plan was aborted, Ms. Baumgartel had relied on a distinction with another case that the transfer took place in public rather than in private, but the plan was for it to take place in private, is your point. That's correct, Judge Lynch. And to Judge Calabresi's point where you asked about, would I discuss what elements of trust are inherent in this transaction, one of the elements of trust that's important is that aborted plan. If Espino was just a dupe, as the defense has suggested, then he would have been more inclined to continue to get that room because that seemed to be what was of overriding importance when he first walked into the hotel. But immediately upon encountering Oscar, what Espino does is he says, oh, hey, what happened? And Oscar says, the room wasn't ready yet. Espino immediately abandons that plan to get the room, and that's a telling point because Espino has the autonomy and knows, in fact, what's in those suitcases, in those duffel bags, rather, but he has the autonomy to decide, okay, I'm going to abandon this plan to get the room, I'm going to take the drugs now and walk out. That's also important and indicative of drugs because he knows that it's more important to get out of that hotel room and get out of that public space than to get the room. Now, if the suitcase contained any of these other things that have been talked about, whether it's sturgeon roe or computer parts or anything of the like, all of those items that are discussed in other cases are actually legal in some contexts. There may be illegal contexts. In fact, the defendant's brief often inserts the word stolen in front of those items. So whether it's diamonds, as Judge Calabresi suggested, or gold dust, et cetera, those are items that are generally legal to possess in some circumstances. But heroin is virtually never legal to possess, particularly in a public area, and so here Espino knows what's of overriding importance is get out of that hotel room. And so he overrides the plan to get the actual room and he gets out of that. He gets out of that. Right. He decides we're not going to go to the room and look at the drugs. That would be important to do, but it's more important now that I know that room's not ready to just get out of here. That's another indicator. So is that four? Are we up to four now or are we taking you off your list? I got off my list. Well, I have room 126, suitcase 20 kilos. We want it repacked. So in other words, he's going to see, the expectation is that he's going to see what's going into the bag. And then the autonomy to revise the plan. Let's do the money, Your Honor. I think the money is very important. You do whatever you want. The money is very important, Your Honor. And it's important to consider the point of view regarding the money. I think the defense has the wrong point of view here, which is to focus on Oscar's point of view and the $15,000 being paid to Oscar. More importantly, I think, is to look at the point of view of the DTL, the drug trafficking organization, or the cartel at issue here. I think, actually, Anderson captures this well. And I'm just going to read this quote briefly. This is Anderson herself. It's her testimony at trial in the Anderson case. She said, there had to be an element of trust involved. And if you didn't trust a person or know the person personally, then you wouldn't want to give them 20 pounds of ecstasy. Otherwise, that person could simply drive off into the sunset with the drugs and the organization would be out of a lot of money. So on this point of giving the money to Oscar, what I think is important here is looking at how much control over proceeds, money and goods, did Espino have. And the answer is a lot. He had $2 million in heroin that he was picking up, street value, and he had $15,000 in cash that he was entrusted with dropping off to Oscar. Yeah, but how does the fact that the heroin is worth that much, which unless he knows it's a heroin, he doesn't know that, tell us anything about the value he was entrusted with? We know he was entrusted with $15,000, which in these days of inflation ain't that much to say that we're really entrusted. And what he was entrusted, the thing which you're suggesting suggests to us is the thing we have to know what he knew about. It's that drive off into the sunset quote that I read in Anderson. The DTO knows that Espino had several options here. Option A could have been, he could have taken that $15,000 in cash and just run, not shown up to the Ramada and taken the money. B would have been, he goes and he meets Oscar, he takes the $2 million in heroin and doesn't give Oscar the $15,000, makes an excuse and says there was a mix up, someone will meet you 10 minutes later. Option C is that he pays the $15,000 to Oscar, takes the $2 million in drugs, and then runs off from the DTO and tries to sell him on the street on his own. Whether or not he was going to do that, because he's arrested before we see ultimately what happens, it's clear that the DTO trusts him enough to not only deliver the money to Oscar but also to pick up the drugs and take them where else they need to go. Kelsey Perea, who's the Uber driver who testified in this case said that she routinely picks up packages for other people and takes them places without taking passengers along for the ride. What that signifies is that this DTO could have just had Ms. Perea go to the hotel, pick up the duffel bags from wherever Point B was. It's clear, though, that the DTO wanted Espino there. They wanted his hands on the drugs to pick them up to ensure safekeeping, and more importantly, they wanted him to pay Oscar. Right, but there was no expert testimony that said DTOs don't use dupes because dupes are unreliable. There was nothing like that at this trial, right? No, there wasn't, Your Honor. On this issue of trust, the other thing that I wanted to address in terms of the trust was the Uber situation, which the defense calls it this is how taxis work, but in fact what happened was that Espino arrived in one taxi. The other taxi had been ranged by someone else who wasn't him, and I think that's an important additional element of communication that isn't discussed here. He not only was communicated to Room 126, but he was also communicated that another Uber is going to be there to pick you up immediately upon taking possession of the drugs. And just my last point as I see my... How does that indicate particular trust, and how does that indicate particularly drugs rather than anything else? Well, each one of these circumstances standing alone may not indicate drugs per se, but we're saying the overwhelming conclusion which the jury rationally drew based on all the facts and circumstances is that it could only be drugs. Well, he also carried one of the duffel bags, right? That's right, and I didn't get to my entire list, but that's another key point, Your Honor. He feels it, and he carries them, and that's a distinguishing factor between Torres and Lorenzo, where the objects are hidden inside other objects. In Lorenzo, the drugs were hidden inside clothing inside the suitcase. In Torres, the drugs were hidden inside secret compartments inside cabinetry. Here, they're... I mean, so what did it look like in the duffel bag? What did the jury hear or see about how the drugs were packaged in the duffel bag? They saw both the drugs at the time they were seized and the sham drugs, including the one kilo of real drugs. Right. I mean, the sham drugs is what matters, because that's what Mr. Espino actually carried, right? Right. They were an exact replica of the real drugs. They were kilo-sized bricks individually packaged. They were not wrapped together, so they were loose, and they were divided between two duffel bags. Each duffel bag weighed approximately 22 pounds, and if you were to pick them up, they would jostle around. You would feel a series of bricks inside the bag banging against you as you picked them up. It's a significant... You see, I see all the differences you're saying between this case and Torres. I have no problem saying this case ain't like Torres, because he wasn't... he wasn't alone here, but he was. I don't... I have more problems saying this case is like Anderson, because in Anderson you did have all those background telephone conversations which suggested real trust of the person. So what we're solving in between, and where I'm struggling is to see whether what we have, in fact, either indicates trust, sufficient to say trust, therefore it must be drugs, or directly indicates drugs. And it's there, but I'm having more of a struggle, and I must say, you're listing seven cases, seven things. It hasn't turned me against your position, but it hasn't helped me an awful lot. Your Honor, with respect to Anderson, there's three key factors that I think are relevant to that opinion. One is the extensive phone contacts. Granted, that was more extensive than what we had here. Now, with regard to the phone, that phone had been deactivated four days before the defendant was arrested, so the phone doesn't prove anything one way or another. We have two key contacts that we know happened, we just don't know how. That is the room 126 was directly communicated to Espino, and the fact that another Uber will be there to pick you up at the hotel. On the other two factors in Anderson, this case is stronger. In that case, they talked about being entrusted with 30,000 pills, which were worth $900,000. This was $2 million worth of heroin, and Anderson never even took possession of the bag. It was located in the Chevy Silverado. Excuse me, Hakimi never took possession of the bag. It was located in Anderson's vehicle. Lastly, Anderson referenced just a general propensity of Hakimi to be in the right place at the right time. But even the meeting that took place in the Walmart in Anderson was far more awkward than the meeting that happened here. There, they had to feel each other out. Hakimi whistled, they sort of waved. Here, Espino and Oscar met directly, exchanged the bags, took them right to the car. They each knew what they were there to do, and the room 126 factor, again, shows that Espino, for lack of a better term, was read into the plan. He understood exactly what the plan was and had the autonomy to change it once he realized that it was better to get out of the hotel than to just get a room. All right, so you're way over. You haven't talked about jury instructions at all. I don't know if you wanted to, but I guess I'd give you a couple of minutes to do that. We rest on our papers for that, Your Honor. All right. Thank you. So, Ms. Baumgartel, you have two minutes of rebuttal. Putting the podium down. Yeah. For us midgets. Okay. Your Honor, I want to start with the repackaging, because this is an important point. The testimony was extremely clear that Oscar was supposed to repackage the drugs before he handed them off. That's at A107. It's also at the... What does it mean, repackage them before he handed them off? He was supposed to... A suitcase is being brought, right? No, Your Honor. The testimony is that Oscar's brother told Oscar to repackage the drugs before he delivered them. That's Appendix 107, the government supplemental Appendix 33-34, and then the transcript of that conversation was 303T. So, the idea that Oscar is supposed to be repackaging the drugs, there was never any evidence that the plan was for Espino to receive the drugs and repackage them. That is not the evidence. Why does he bring an empty suitcase? Your Honor, there was no evidence as to why at trial. I could speculate, but that's what we're doing. So, it could have been... But I understand. How is it possibly consistent with the idea that Espino is supposed to... I'm sorry, that Oscar is supposed to buy a suitcase, take them out of the duffel bag, and put them into what? We don't know how he was supposed to repackage them. There's no testimony about that. The testimony is his brother tells him he wants... But then why does the courier show up with an empty suitcase? It doesn't make any sense. Unless there is a plan to do the repackaging in the presence of the courier. There are three reasons. One could be he's taking a suitcase to blend in at the hotel. Another could be he's carrying the $15,000 that he brings in the suitcase and doesn't want to just carry it empty. And another could be that he was going to put whatever he had into the suitcase without repackaging it. So, again, there's no testimony about this at trial, except to say that Oscar personally was supposed to repackage it. And so, the government's speculation that somehow Espino was going to see it... But the delivery is still supposed to take place in a hotel room. That's the whole point. That's true. So it's not like a case in which there's... It winds up being a transfer in public without anyone looking inside the duffel bags. But that's not what was supposed to happen. It's the clear inference that a jury could draw from the evidence that the man shows up with an empty suitcase to go to a hotel room to make a transfer in private. Right. So, even if the transaction was supposed to... The transfer was going to happen in a hotel room, there's both a factual and a legal problem with trying to infer Mr. Espino's intent from that. The factual problem is we don't know what was going to happen in the hotel room. The government is talking about an opportunity to see the contraband, but we don't know how it was going to be repackaged if Oscar had actually... It's going to go in the suitcase. I mean, that's the point. But, Your Honor, the legal problem as well is that... And this goes to the government's point that, oh, Mr. Espino is guilty because he felt the duffel bags. If Mr. Espino only had knowledge of the contents of the bags after he picked them up, he wouldn't be guilty of conspiracy. Oh, but come on. But you're not sending a guy who doesn't know he's going to be dealing with... I mean, in this case, granted, maybe he's just going to see bricks packaged with duct tape around them. But if, for example, he was going to actually see the white powder, that can't be somebody who's a dupe, who's just going to find out at the time, oh, my God, I'm dealing with heroin? That's right, Your Honor. If there was evidence he was going to see the white powder... But if there's evidence he's going to see something from which a reasonable person would be pretty confident that this is drugs, then it's the same story. It's a harder inference if it's just bricks and duct tape, but it's the same basic inference that would happen if it was piles of white powder that they've got to put into bags or something like that. But there was no evidence that he was actually going to see it. And I also want to comment as another factual matter, the government said that it was designed to look exactly like the drugs. That's not right. It was sham that the DA had used and put together in other cases. It was rectangular packages, and pictures of it are at A527 to A528. It's just, it has an electronics label on the front of it, and it's just bland rectangular packages. A person seeing that, first off, it's a duffel bag. Second, a person seeing a bland rectangular package does not know that they are drugs. But wait, I want to be clear on this. So if the evidence was or were that the brick rectangular packages were going to go into the suitcase that your client brought, you still would be of the view that that's not enough to show his knowledge and intent? If the evidence was that Mr. Espino personally was going to be responsible for repackaging them, that would be a hard case. No, he's going to be present in the room when rectangular brick packages get put into his suitcase. Your Honor, that's not the evidence. No, I know it's not, but it seemed to me like a minute ago you were saying that wouldn't be enough because they're rectangular packages with some markings on them. Your Honor, I definitely don't want to argue a worse case than I have, so I'm not going to argue that. I also want to talk about the money, just because that amount wouldn't buy you even one kilogram of heroin, and it's almost the exact amount that in Taurus this court recognized was consistent with engagement in a lot of different criminal behavior and wouldn't indicate drugs specifically. And I also, just very briefly on Anderson, in that case, because you had a cooperator, you had the testimony that the government cited, which is someone saying that this particular drug trafficking organization would only entrust drugs to someone who was a trusted member of the conspiracy. Here you didn't have that kind of testimony, and in fact you had the opposite. You had the agents testifying that this organization, there was evidence that it compartmentalized and did not inform everyone who was involved in it about the different activities that were happening. You had evidence that a cab driver who apparently had no knowledge of illegal activity was participating in this. And so it's really the opposite. But the argument then would be that there are two dupes here. The cab driver's a dupe, and the person who's going into the hotel room is a dupe. I'm not saying this being a dupe, Your Honor. I'm saying that unlike Anderson, there's no evidence that this particular conspiracy only entrusted product to trusted members. The evidence is the opposite. And for that reason... And there's no expert testimony, right? Correct. My time has expired. Thank you. All right. Well, we got our money's worth. Well argued. Thank you both. We will reserve decision. Thank you.